*Nov. Term, 1851.*

STATE BANK OF INDIANA *v.* RODGERS.

*G. Holland,* for the appellant.

*J. Ryman,* for the appellee.

---

THE STATE BANK OF INDIANA *v.* RODGERS.

A bill of exchange was drawn, payable at *Cincinnati,* but the parties thereto were all residents of this state. *Held,* that the bill was within the meaning of the statute, which allows damages, upon the usual protest for non-payment, on bills drawn on persons without the jurisdiction of the state.

A bill of exchange was sold to the *State Bank,* the plaintiff, at her branch in *Lawrenceburgh,* by two of the parties, who were partners, for their own benefit, the plaintiff knowing the bill to be an accommodation bill. The greater part of this bill was paid, just before it became due, by the sale of another to the plaintiff, and the application of the proceeds to the payment of the first. When the second became due, it was paid by the sale of another to the plaintiff, of like amount, and the application of the proceeds in like manner. This process of paying each preceding bill by another of like amount, continued through a series of bills, and up to the non-payment of that on which this suit was brought; and each bill, after the first, was purchased with the understanding that the proceeds were to be applied to the payment of the preceding one. The bills all varied in respect to the parties—there being some to each bill who were not parties to the others. Each was made payable in four months from the time of the sale thereof to the plaintiff, at *Cincinnati,* but the parties were all residents of this state. The plaintiff, when she

Nov. Term,
1851.

State Bank
of Indiana
v.
Rodgers.

purchased the bills respectively, charged and received interest thereon at the rate of 6 *per cent. per annum* and three-fourths of 1 *per cent.* exchange. The cost of transporting specie between *Lawrenceburgh* and *Cincinnati*, did not exceed, during all this time, 2 dollars upon the thousand. At the time these several bills were sold to the plaintiff, there was a standing rule of said branch, that no note should be discounted having more than ninety days to run. *Held,* that the transactions recited did not show a device of the plaintiff to exact usury.

Wednesday,
November 26.

APPEAL from the *Ohio* Circuit Court.

Smith, J.—Assumpsit by the appellant, upon a bill of exchange drawn by one *John Grace* upon *John 'B. Craft,* at *Cincinnati, Ohio,* and requesting said *Craft* to pay to the order of *Lanius* and *Athearn,* 800 dollars, four months after date. The declaration alleges that *Lanius* and *Athearn* indorsed the bill to *Rodgers,* who indorsed it to one *Espy,* who indorsed it to the appellant, who purchased it through her branch at *Lawrenceburgh.* It is averred that the bill was accepted by *Craft,* but was duly protested for non-payment, of which the defendant had notice, whereby the defendant became liable to pay the sum therein specified, with 5 *per cent.* damages.

The cause was submitted to the Court upon the general issue, and the plaintiff's damages were assessed at 800 dollars. A motion for a new trial having been overruled, judgment was rendered for that amount. From this judgment, the plaintiff appealed to this Court.

Upon the trial, the bill of exchange described in the declaration, the demand of payment, protest, and notice of non-payment, were duly proved.

The defendant then proved the following facts:

On the 17th of *December,* 1846, the plaintiff purchased a bill for 1,000 dollars, payable on the 17th of *April,* 1847, at *Cincinnati.* The names of *Craft, Lanius* and *Athearn, Rodgers,* and also one *Steele* and one *Tapley,* were upon this bill, which was paid at *Cincinnati* when due.

On the 15th of *April,* 1847, the plaintiff purchased another bill for 800 dollars, drawn by *Craft* on *Rodgers,* and indorsed by *Lanius* and *Athearn, Steele,* and *Grace,* payable in four months at *Cincinnati,* the proceeds of which were paid by the bank on the check of *Grace,* and were

probably used in paying the bill first named. This second bill was due on the 18th of *August*, and was returned to the bank unpaid.

On the 19th of *August*, the bank purchased another bill for 800 dollars, also payable in four months at *Cincinnati*, drawn by *Craft* on *Rodgers*, and indorsed by *Lanius* and *Athearn*, *Steele*, and one *Caleb A. Craft*, the proceeds of which were applied to the payment of the bill due on the 18th of *August*.

On the 30th of *December*, another bill was purchased, drawn by *J. B. Craft* on *Rodgers*, and indorsed by *Lanius* and *Athearn*, *Espy*, and *Grace*, payable in four months at *Cincinnati*, the proceeds of which were applied to the payment of the bill purchased on the 18th of *August*.

On the 1st of *June*, 1848, the plaintiff purchased the bill now in suit, the proceeds of which were drawn by one of the parties and applied to the payment of the bill purchased on the 30th of *December*.

On each of these bills, the plaintiff charged and received interest at the rate of 6 *per cent. per annum*, and three quarters of 1 *per cent.* exchange.

The defendant then introduced *William Lanius* as a witness, and proved by him that *Lanius* and *Athearn* were the persons who really received the proceeds of said first named bill of exchange, and they alone were the persons really benefited and accommodated by the negotiation of all the bills, the other parties, on each, having put their names thereon for the accommodation of said firm.

*Lanius* also testified that the object of the firm of *Lanius* and *Athearn*, in having the first bill made up, was to obtain a loan from the bank, believing they would be more likely to get the money by the sale of a bill, than on a note, as the bank could make more profit thereby; that the bill was not founded on any business transaction, and the parties to it were not indebted to each other, or to the firm; and that, when it was discounted, *Lanius* and *Athearn* did not expect to have funds in *Cincinnati* to meet it, arising from any shipment or commercial transaction which would put money there.

He further testified that he was a director of said branch, at the time, and believed the board knew that the first bill, and all the others, were negotiated for the benefit and accommodation of his firm; and that, at the time of the sale of each of the subsequent bills after the first, it was understood by said branch, the proceeds would be applied to take up the next preceding one.

He also testified that, at the time each of the bills was sold, *Lanius* and *Athearn* were engaged in the business of distilling whisky and manufacturing flour, and shipped their products to *Cincinnati*, but always received returns next day; that all of the parties on all the bills were, at the date of the first bill, and ever since have been, residents of *Ohio* county, *Indiana*, which fact was known to the officers of said branch; that *Lawrenceburgh* is only twenty-two miles from *Cincinnati*, and 2 dollars would pay the expense of carrying 1,000 dollars in specie from one of those places to the other.

The plaintiff then proved, by the cashier of said branch, that the several bills were each of them complete and perfect, and accepted by the drawee, at the time they were purchased; that the exchange charged was the usual and current rate at which said branch, at the times the bills were purchased, was buying bills on *Cincinnati;* that he attended the sittings of the board when the bills were bought, and heard of no understanding or agreement at the sale of either, that another bill would be purchased or a note discounted to enable the parties, should they otherwise be unable, to meet it at maturity; that his impression was, from what *Lanius* told him, that *J. B. Craft* was the real debtor on said bill as between the parties; that none of the parties at, or shortly before, the sale of either of the bills, had applied for a loan of money, without success; and that, when the bills were presented, there was a standing rule of said branch that no note should be discounted having more than ninety days to run, so that, without suspending this rule, a note at four months could not have been discounted.

*Lanius* also testified that he gave the board of directors

Nov. Term,
1851.

STATE BANK
OF INDIANA
v.
RODGERS.

to understand that the first bill was for the use of his firm, but does not remember that he told the board the bill was not founded on a business transaction, or that he did not expect to have funds in *Cincinnati* to meet it.

The appellant contends that she was entitled to interest on the bill from the date of its maturity, and to damages for its non-payment.

The judgment is for the amount of the bill, without interest or damages, and the appellee endeavors to sustain it on two grounds:

1st. As respects the damages, that the appellant was not entitled to any, because the parties to the bill were all residents of this state, and, therefore, the bill is not within the meaning of the statute which authorizes damages on bills drawn on persons without the jurisdiction of the state. R. S., c. 31, s. 18, p. 579. It has been settled, however, in the case of the *State Bank* v. *Bowers*, 8 Blackf. 72, that such a bill is within the statute.

2d. The appellee contends that the Circuit Court rightly refused to give interest or damages, because the evidence shows that a loan was made in the shape of a bill, or series of bills, as a usurious device to exact more than the legal rate of interest. If such was the fact, that is, if the plaintiff did make the loan in that particular mode or form for the purpose of evading the law on the subject of usury, and not as a *bona fide* exercise of her legitimate powers, this position of the appellee may undoubtedly be correct; and the principal question we have to examine, is, therefore, whether the evidence warrants such a finding.

With regard to the origin of the first bill in the series, it may be regarded as proved that the board of directors knew it was sold to them for the benefit or accommodation of *Lanius* and *Athearn*, but, from that fact alone, no inference could be legitimately drawn that they intended to make a usurious loan. They had a right to deal in bills of exchange, and nothing is more common than the negotiation of bills where one of the parties is known to be the principal and the others merely sureties, when

such bills are, in fact, founded on ordinary commercial transactions. *Lanius*, it is true, testified that the bill was offered for the purpose of obtaining a loan, that it was not founded on any commercial transaction, and that his firm did not expect to have funds to meet it at maturity. But it does not appear that he communicated any of those facts to the board of directors, and no inference affecting the rights of the plaintiff can be fairly drawn from these secret or uncommunicated motives of *Lanius*, or *Lanius* and *Athearn*.

Neither do we think the facts that exchange was charged on each bill in the series, and that each bill after the first was discounted with the understanding that the proceeds should go to take up the preceding one, amount to proof of a design to make a continuous loan or to charge usurious interest. Where a bill is drawn in good faith upon a distant point, and the acceptor is unable to meet it when due, it may often be greatly conducive to the interest of the drawee, or other parties interested, to be able to negotiate a second bill for the purpose of paying off the first, and we cannot see any impropriety in the bank permitting them to do so at their solicitation. In the present case, all of the bills in the series varied from each other in respect to the parties, there being names on each one not on any of the others. We are not sure that this fact would make any material difference, but, at all events, we think that, in this case, the negotiation of each bill, so far as appears from the evidence, was a separate and distinct transaction.

The only remaining fact which is urged as conducing to prove the design imputed to the plaintiff, is, the difference between the rate of exchange charged, three-fourths of one *per cent.*, and the cost of transporting specie between *Lawrenceburgh* and *Cincinnati*. We do not think there is any evidence whatever that the rate charged was exorbitant or illegal. The cost of the transportation of specie, certainly, is not the proper criterion to judge of the value of exchange (1).

Upon the whole, if all the facts detailed in the evidence

had been shown to have been within the knowledge of the bank, and if the whole series of bills had been the result of a previous contract or understanding between the parties to make a continuous loan, charging exchange at intervals by way of addition to the legal interest on ordinary loans, those facts might have warranted a very different decision, but as there is no evidence whatever of such a knowledge or agreement on the part of the bank, we can see no satisfactory grounds upon which the charge of usury can be sustained.

*Per Curiam.*—The judgment is reversed with costs; and the proceedings back to the finding of the Court upon the issue submitted are set aside, with directions to the Court to render a judgment in conformity with this opinion.

*P. L. Spooner*, for the appellant.

*J. W. Chapman* and *E. Dumont*, for the appellee.

(1) There is no rule of law fixing the rate which may be lawfully charged for exchange. Though the price is influenced by the cost of the transportation of specie from one place to another, yet it is also materially affected by the state of the trade, by the urgency of the demand for remittances, and by the quantity brought into the market for sale; and, sometimes, material changes take place in a single day, although no alteration has taken place in the expense of transporting specie. *Andrews* v. *Pond*, 13 Peters, 65.